## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

STERLING MERCHANDISING, INC.  *
                              *
        Plaintiff           *
                              *
v.                           *     **Civil No. 06-1015(SEC)**
                              *
NESTLE, S.A., et al         *
                              *
        Defendants      *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

Pending before the Court is Co-Defendant Nestlé, S.A.'s Motions to Dismiss for lack of *in personam* jurisdiction (Dockets ## 21, 118 & 132) and Plaintiff's oppositions thereto (Dockets ## 66, 125 & 133). After reviewing the filings, their exhibits, and the applicable law, Nestlé S.A.'s motions to dismiss will be **DENIED**.

**Factual and Procedural Background:**

Plaintiff in this case is Sterling Merchandising, Inc. (hereinafter Sterling or Plaintiff), a corporation organized under the laws of Puerto Rico, who is engaged in the market for the distribution of ice cream products in Puerto Rico. Sterling sued the Defendants, Nestlé, S.A. (hereinafter NSA), Nestlé, Puerto Rico, Inc. (hereinafter NPR), and Payco Foods Corporation (hereinafter Payco), <u>see</u>, Docket # 129, Amended Complaint,[1] under the Clayton Act, 15 U.S.C.A. §§ 14, 15 & 26; the Sherman Act, 15 U.S.C.A. §§ 1, 2 & 3 and the Puerto Rico Anti-Monopoly Act. Sterling avers that the Defendants have engaged in exclusionary practices towards monopolizing the ice cream distribution market in Puerto Rico. It alleges that

> [d]uring the early 1990's, the ice cream market in P.R. had many manufacturers and distributors. Today, that market is controlled by Nestlé and Payco by virtue of their aggressive acquisition strategy and agreements over the past dozen

---

[1]Originally Plaintiff had also directed its complaint against Nestlé Holdings, Inc. (NHI). See, Docket # 11. However, upon concluding jurisdictional discovery, Plaintiff voluntarily dismissed the complaint as to NHI, and the Court entered an order dismissing the claims against NHI without prejudice. <u>See</u>, Dockets ## 20 & 117.

Civil No. 06-1015(SEC)                                                      2

> years, vertical exclusive dealing agreements with retailers in Puerto Rico, and
> related anticompetitive agreements and practices, all of which have continued
> to the present.

Docket # 129, Amended Complaint at ¶ 18.

Sterling claims that it is the only successful entrant to the ice cream distribution business in Puerto Rico in at least the past twelve years, in part because of Defendants' massive market share: 70%, and significant barriers to the entry into the market, like the need for sunk capital and extensive routes to support high fixed costs. See, Docket # 129, ¶¶ 15 -16. Moreover, the 70% market share Sterling attributes to the Defendants does not take into consideration the fact that Nestlé recently acquired Dreyer's, the manufacturer of Edy's, Sterling's primary brand, giving Nestlé indirect control over the prices under which Sterling may purchase Edy's ice cream for resale. Id.

By 2001, after Nestlé's acquisition of Mantecados Nevada, the only viable competitors in the ice cream distribution market were Nestlé, Payco and Sterling. However, in June 2003, NSA, through its local subsidiary, NPR, entered into an agreement to buy Payco through a Stock Purchase Agreement (hereinafter the SPA). See, Docket # 129, ¶ 28. Nestlé's purchase of Payco, and its indirect control over Dreyer's, gave it effective control over 80% of the ice cream distribution market in the island. Docket # 129, ¶ 29. Sterling further contends that Nestlé's acquisition of Payco was analyzed and approved by the Puerto Rico Office of Monopolistic Affairs (hereinafter OMA) subject to several conditions. One of the conditions was that, were Nestlé to buy Dreyer's, which it later did, it could not strip the Plaintiff of its rights to distribute the Edy's brand unless certain conditions were met. After signing the consent order, Nestlé attempted to buy Sterling, through coercion and without obtaining the OMA's consent, threatening Sterling that things could get difficult if it did not sell the business to Nestlé.

Moreover, after Nestlé acquired Dreyer's, the latter notified Sterling that its selling prices to Plaintiff could rise because of Nestlé's control over Dreyer's. In 2003, Nestlé allegedly increased the selling price of Edy's to Sterling, without a similar raise of prices to

**Civil No. 06-1015(SEC)**                                                                    3

distributors in the United States, which Sterling catalogues as a price-cost squeeze which adversely impacts competition in the relevant market. Docket # 129 ¶¶ 23-35.

Sterling also avers that Nestlé has induced a substantial percentage of retail stores in the relevant market to engage in exclusive and exclusionary dealings in order to maintain a monopoly and attempt to destroy Sterling. Docket # 129, ¶ 36-39. Furthermore, Nestlé has a 100 % market share in several towns in Puerto Rico, causing injury to Sterling and consumers who are denied the option of purchasing ice cream products of equal or greater quality at substantially lower prices. Id., at ¶¶ 41-42.

Finally, the complaint also contends that prior to Nestlé's purchase of Payco, these two entities conspired with each other in order to coordinate their offers of payments to retailers for shelf space. Docket # 129, ¶ 43.

Defendants' anticompetitive practices, Sterling alleges, caused injury to consumer welfare and caused Sterling to lose sales, profits, good will, investment capital, and business opportunities. As a result, the value of Sterling's business has decreased. Docket # 129, ¶ 49.

NSA and NHI filed motions to dismiss for lack of *in personam* jurisdiction. See, Dockets ## 20 & 21. Sterling moved to stay the adjudication of said motions and for the Court to allow some jurisdictional discovery as to both defendants. See, Docket # 27. Five months later, this case was reassigned to the undersigned. See, Docket # 72. Briefly thereafter, the Court granted Plaintiff's request to conduct jurisdictional discovery only as to NHI as Sterling had already filed an opposition to NSA's motion to dismiss. See, Docket ## 66 & 81. After the Court's ruling on various discovery motions, the filing of an amended complaint (Docket # 129), NSA's renewal of its motion to dismiss, and supplemental motions by both parties in support of their positions, the Court is in position to rule on the issue. After a thorough review of the parties' filings, the evidence in the record, and the applicable law, the Court rejects NSA's attempt to disentangle itself from the adjudicative power of this Court.

**Standard of Review**

**Civil No. 06-1015(SEC)**                                                                 4

NSA's motions to dismiss should be addressed as a motion under FED.R.CIV.P.12(b)(2). Under that rule "plaintiffs bear the burden of proving the court's personal jurisdiction over the defendant." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, 290 F. 3d 42, 50 (1st Cir. 2002). When, as here, personal jurisdiction is contested, plaintiffs need to provide evidence of the "**facts** upon which the existence of jurisdiction depends." United Electrical, Radio & Machine Workers of America et al. v. 163 Pleasant Street Corp., 960 F. 2d 1080, 1090 (1st Cir. 1992)(hereinafter 163 Pleasant St.)(quoting, McNutt v. General Motors Acceptance Corp., 298 U.S. 178 (1936)). In evaluating a motion to dismiss for lack of personal jurisdiction, the Court "must accept the plaintiff's properly documented evidentiary proffers as true for purposes of determining the adequacy of the prima facie jurisdictional showing." Daynard, 290 F. 3d at 51. These facts should be construed "in the light most congenial to the plaintiff's jurisdictional claim." Id.  The Court may also "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." Id.

**Applicable Law and Analysis**

In order for the Court to hear a case, it "must have personal jurisdiction over the parties, that is, the power to require [them] to obey its decrees." Daynard, 290 F. 3d at 50. The first focus of the Court in this process must be on the jurisdictional basis of the case. That is, the first question to be answered is whether the case entered the Court through the door of federal question or the window of diversity jurisdiction. The question of personal jurisdiction in the former case rests on an application of the Fifth Amendment to the United States Constitution (hereinafter US Constitution), whereas, in the latter case, the Fourteenth Amendment must be applied. See, 163 Pleasant St., 960 F. 2d at 1085. The distinction is of substance; because federalism concerns present in diversity cases are absent in a federal question case, "a federal court's power to assert personal jurisdiction is geographically expanded." Id. Therefore, in these cases "the Constitution requires only that the defendant have the requisite minimum contacts with the United States as a whole, rather than the

Civil No. 06-1015(SEC)                                                                    5

particular forum state as would be required in a diversity case." Id.

Plaintiff's opposition to NSA's motion to dismiss slightly takes note of the distinction. However, the distinction is of not much consequence here since; although Plaintiff averred that NSA "undoubtedly" has contacts with the United States as a whole, see, Docket # 66, at p. 14, the averment was not supported by materials of evidentiary quality as required by the standard set forth above. 163 Pleasant Street Corp., 960 F. 2d at 1090.

As such, the Court will look at the issue of whether NSA is subject to this Court's jurisdictional power, through the lens of the Fourteenth Amendment, as done in diversity cases. To do so, we must look at Puerto Rico's long-arm statute which allows Puerto Rico courts to exercise jurisdiction over a non-resident defendant, as NSA, in the event that it (1) transacts business in Puerto Rico personally or through an agent, or (2) has participated in a tortious act within its territory. Negrón-Torres v. Verizon, 478 F. 3d 19, 24 (1st Cir. 2007)(hereinafter Verizon). However, we will focus on the constitutional inquiry of the Fourteenth Amendment, as the First Circuit has frequently noted that "the reach of Puerto Rico's long-arm statute stretches up to the point allowed by the Constitution." Id.

The principles of due process embodied within the Fourteenth Amendment require "the plaintiff to prove the existence of either general or specific jurisdiction." Id. Central to both inquiries is the need for the Defendant, who is involuntarily haled into court, to have minimum contacts with the foreign forum. Id. These minimum contacts must be sufficient for the forum state to find that maintaining the suit therein "does not offend traditional notions of fair play and substantial justice." Id., citing, Intl. Shoe Co. V. Wash. Off. Of Unemployment, 326 U.S. 310, 316 (1945). Because both parties have addressed their arguments and evidentiary support towards the presence of specific personal jurisdiction, or the lack thereof, we will overlook their in passing reference to general jurisdiction over NSA,

Civil No. 06-1015(SEC)                                                                                    6

and will only discuss the merits of the specific jurisdiction claim.[2]

The gist of NSA's motion to dismiss is that, as a Swiss corporation totally disconnected from Puerto Rico but for its subsidiary, NPR, it has no minimum contacts within this forum. In support of this contention, attached to NSA's motion to dismiss is an affidavit from Stephen Raffé, the Regional Operations Director (Zone Americas) of NSA. He avers, under oath, that NSA: (1) is a Swiss corporation with its principal place of business in Vevey, Switzerland; (2) does not have any employees or offices in the Commonwealth of P. R.; (3) does not own or lease real property in P.R. and does not pay taxes therein; (4) does not have any bank accounts in P.R.; (5) does not hold books or records in P.R.; (6) has no officers or directors residing in P.R.; (7) to the best of his knowledge, does not have business relationship with the Plaintiff; and (8) is not engaged in any continuos systematic business activities in the forum. See, Docket # 21, Ex. 1 ¶¶ 1-13.

NSA further avers that Plaintiff's attempt to bring NSA to this Court is premised in a mistaken belief that NPR, is not only NSA's subsidiary, but its *alter ego*. If we take that averment as true, Plaintiff's jurisdictional claim would be an uphill struggle. It is well-settled law that the mere fact that a subsidiary company does business within a state "does not confer jurisdiction over its nonresident parent, even if the parent is the sole owner of the subsidiary. There is a presumption of corporate separateness that must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary."  Verizon, 478 F. 3d at 27. Furthermore, in order to pierce the corporate veil under Puerto Rico law, strong and robust evidence is required "showing that the parent [has a] degree of control over the subsidiary as to render the latter a mere shell for the former." Id.; see also, Castro v. Sanifill, Inc., 198 F. 3d 282, 284 (1st Cir. 2000)("In determining whether to disregard the corporate form, courts

---

[2]Also, because we find that Plaintiff has provided sufficient evidentiary support for the Court to find personal jurisdiction over NSA under the specific jurisdiction theory, it is unnecessary to discuss the more stringent standard of general jurisdiction. See, Verizon, 478 F. 3d at 27. ("It is well established that the standard for finding general jurisdiction is considerably more stringent than that applied to specific jurisdiction questions.")

normally conduct a high fact-specific inquiry, including, *inter alia*, consideration of the extent to which a subsidiary may have disregarded corporate formalities; the degree of control exercised by the parent over the day-to-day operations of the subsidiary; overlap in ownership, officers, directors, and personnel; and whether the subsidiary was adequately capitalized.")

Plaintiff demurs to the application of the "mere shell" standard, arguing that "the fact that [NPR] is 100% owned by [NSA]... is far from the only contact NSA has had with Puerto Rico... [since] NSA acted in concert with [NPR] to dominate the island's ice cream trade." Docket # 66, at p. 16. As such, Plaintiff reasons, "[NSA] is subject to personal jurisdiction in [P.R.] by virtue of its **own, voluntary contacts** with the jurisdiction that are related to the underlying antitrust claims in this lawsuit, as well as the contacts of its **agent** and subsidiary, NPR...." Id. (emphasis added) Therefore, Plaintiff's jurisdictional claim is that NSA's own contacts with Puerto Rico, and its concerted actions with NSA, are specifically related to this litigation and  enough to bring it within the Court's adjudicative power. The First Circuit in Donatelli v. National Hockey League, 893 F.2d 459, (1st Cir. 1990), recognized that there are a number of ways in which a parent and its subsidiary can be haled into court together, even when the parent has no physical presence in the forum. The mere shell standard is not alone.

In Donatelli, the First Circuit stated that "[d]espite the fact that corporate entities are distinct and their veils unpierced, courts can - and usually do- an actual inquiry into the nature of the interrelationship before abandoning the jurisdictional quest." Donatelli, 893 F. 2d at 465. However, there must be a **plus factor** besides the "mere presence of the bosom of the corporate family", in order to warrant the exercise of jurisdiction over the parent. Id., at 465-66. Among this so-called plus factors are circumstances like when a subsidiary acts as an agent for the parent, and the exercise of unusual hegemony by the parent over the offspring's operations. Id., at 466. In sum, the First Circuit reasoned that, "[s]ince the essence of personal jurisdiction is to bring responsible parties before the court, a corporation which is actually responsible for its subsidiary's decision to undertake instate activities should, in

Civil No. 06-1015(SEC)                                                                      8

all fairness, be within the state court's jurisdictional reach." Id.

Therefore, we will discuss herein whether NSA's contacts with the Puerto Rico forum, either on its own, or through NPR's actions as NSA's agent, suffice to comply with the requirements to exercise specific jurisdiction over NSA.

In analyzing NSA's contacts with Puerto Rico, through the test of specific jurisdiction, our attention "must be focused on the relationship among [NSA], the forum, and the litigation." 163 Pleasant Street, 960 F. 2d at 1088. Specific jurisdiction may be asserted over an out-of-state defendant, such as NSA, "where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." Verizon, 478 F. 3d at 24. This is the so-called relatedness prong of the test. However, in order to exercise specific jurisdiction over NSA, the Court must also find that it purposefully availed of the privilege of conducting activities in the Puerto Rico, and that the exercise of jurisdiction, in light of some *Gestalt* factors, would be reasonable. 163 Pleasant St., 960 F. 2d at 1089. That is, all three requirements must be present: relatedness, purposeful availment and reasonableness. Verizon, 478 F. 3d at 24. We analyze each below.

*i. Relatedness*

The relatedness inquiry requires a material connection between the litigation and the defendant's forum based contacts. Id. The material connection must be such that "the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case." 163 Pleasant Street, 960 F. 2d at 1089. As such, "in considering [the relatedness prong of the test] it is important to bear in mind the nature of plaintiffs' claim." Id.

Plaintiff in this case avers that NSA, NPR and Payco conspired with each other to, through anti competitive tactics, take Sterling out of the picture. One of the main allegations is that Nestlé and Payco engaged in an aggressive, and illegal, acquisition strategy which led the ice cream distribution market, composed of at least seven competitors in the 1990's, to be extremely concentrated, in violation of antitrust laws. Plaintiff avers that as a result of this

Civil No. 06-1015(SEC)                                                                              9

monopolizing scheme, there are currently only three remaining competitors: Payco, Nestlé and the Plaintiff. However, Nestlé and Payco may be considered one because of Nestlé's recent acquisition of Payco. Therefore, there are only two viable competitors in the market: Nestlé and the Plaintiff, Plaintiff being the underdog. Proof of Nestlé's apparent intent to monopolize the industry, Sterling argues, is the fact that it has, in many occasions, approached Sterling to buy it.

The following are the facts established by Plaintiff regarding NSA's contacts with the forum, which it argues to be related to this litigation. As stated before, NSA owns 100% of NPR's stock, and, as such, exerts indirect control over NPR. Docket # 66, p. 2. This indirect control notwithstanding, NPR also requires NSA's approval for a number of transactions. Id. Only one concerns us here: no merger, acquisition, or reorganization could be done by NPR without NSA's blessing. Id., at 3. In addition to NSA's required seal of approval for all of NPR's acquisitions, the evidence in the record shows that Payco's acquisition by NPR was procured by NSA. That is, when NPR made the offer to buy Payco, it did so as an agent of NSA. Id., at 4. The offer made to Payco read as follows: "[NPR], **on behalf of [NSA]**, is pleased to submit this formal, binding offer... to acquire (itself, or through one or more of its subsidiary companies) 100 % of the capital stock... of Payco Foods." Id. (emphasis added).

Not only was NPR acting as NSA's agent when it offered to buy Payco -- acquisition which Plaintiff deems to violate the antitrust laws-- but it also led NPR throughout the whole acquisition process. To be precise, NSA's Vice President, Tahira Hassan, provided substantial strategic advice to NPR in the Payco transaction. See, Docket # 66, p. 4. Mr. Andrea Stoffel, NPR's General Manager during the years concerning this complaint, stated during his deposition, that NSA provided "a lot of recommendations and support and advice [during the Payco acquisition]... we had in that moment a close relationship in making this happen." Docket # 66, Ex. E, p. 36-37, ll. 21-26. Furthermore, Mrs. Hassan, and James Singh, NSA's Head of Mergers and Acquisition  visited Puerto Rico as part of their involvement in the acquisition of Payco. See, Docket # 66, Ex. C at p. 16, ll. 16-21 & 17, ll.

11-15.

In addition to NSA's active involvement during the negotiation of the SPA between NPR and Payco, NSA's involvement became an integral part of the agreement. Although the contracting parties were NPR, Payco, and Thomas Ward and Evelyn Ward (as sole owners of Payco at the time of the sale), NSA offered to the seller a "guarantee letter from [NSA]... in the form of Schedule 7.2(j)." See, Docket #3 66, Ex. D. P. 41. Said schedule provides that

> [NSA] (the "Guaranteeing Party") hereby jointly and severally... with [NPR] unconditionally and irrevocably guarantees to and for the benefit of Sellers the performance by Nestlé of all of their respective obligations, covenants, and indemnities arising under the provisions of any agreements between [NPR] and Sellers relating to the matters contemplated by the Stage 1 Agreements... [NSA] will cause [NPR] to comply with its obligations under the Stage 1 Agreements.

NSA agreed that its guaranty over NPR's compliance with the SPA was to be "governed by the laws of the Commonwealth of Puerto Rico." Docket # 66, Ex. D. P. 373. NSA, in its reply to Plaintiff's opposition, argues that such guarantee should not be taken into account because it was already expired, was perfected between non-parties to this litigation, and there is no allegation that such guarantee "somehow violated the antitrust laws." Docket # 69-2, p. 5. We believe that NSA's reads too little into this fact, and interprets the relatedness requirement too strictly. Although we can agree with NSA in that Sterling is not a party to the guarantee agreement, and that such agreement, in itself, cannot be said to violate the antitrust laws, the Court can safely conclude that such guarantee could easily have been a compelling reason for Payco's agreement to sell. And, as stated above, the legality of said purchase is at the heart of the instant litigation.

Plaintiff recently presented further evidence in support of its opposition to NSA's motion to dismiss which reveals some of NSA's substantive input into the Payco transaction. Sterling also provided evidence of two-way communications between NSA and NPR in which the two companies worked together to develop a strategical approach to the  Payco acquisition. Paolo Cittadini, an employee of NPR, addressed to several management officers of NSA, a report on key issues learned during an interview with Thomas Ward, Payco's

owner, and his view on the possible effect of the transaction upon the competition in the ice cream distribution market. The report informed NSA of Ward's optimistic view of the acquisition, noting, in particular, that "Sterling, apart from the loss of Ben & Jerry's in favor of [Payco Foods Corporation] will also lose its current price subsidy from Dreyers and as a result will collapse. The antitrust is just a *façade* issue and will no (sic) have any consequences." Docket # 148-2, p. 2. Furthermore, referring to the Plaintiff, the record continued stating that Plaintiff "simply has no possibility to react at all and its operation will end up by collapsing." Id., at p. 7. Ward's reasons for Sterling's imminent collapse were that it would lose Ben & Jerry's exclusive distribution rights, that Dreyers would remove its subsidy for Edy's ice cream because it was not returning the expected results and that it would aggressively attack Sterling's 250 most important impulse locations, as he was in possession of Sterling's customers list. Id.

The report sent by NPR to NSA also informed the latter of Ward's view with regards to the investigation held by the OMA in relation to the Payco acquisition and its potential violation of antitrust laws. Apparently, Ward believed that the OMA's investigation was *pro forma*, since "never in the story of PR the [Department] entered in this kind of deals and what they are doing in our case is just for the sake of showing some kind of activity in order to save the face after they were practically forced to approve the deal Walmart-Amigo." Docket # 148, Ex. A p. 8.

In Sterling's supplemental filing there are also communications from NSA to NPR with regards to the Payco acquisition. For example, Tahira Nassan, NSA's Vice President, sent an email to Andrea Stoffel, NPR's General Manager requesting some documents be prepared for a conference call regarding the Payco transaction. One of the documents requested was a "statement re-confirming the economic viability of the [Payco acquisition] together with risks and related remedies to move forward...." Docket # 148-2, Ex. C, p.10.

Finally, as stated in Sterling's complaint, the Payco acquisition was reviewed by the OMA and approved subject to some conditions. The agreement was signed by representatives

from NSA, NPR, Payco and the OMA. <u>See</u>, Docket # 66, Ex. G. In said document the Department expressed its opposition to the transaction

> on the grounds of the alleged anticompetitive effects thereof in the relevant market, as defined by the [Department]. Nestlé and Payco disagree with the [Department's] analysis.... Despite the opposing position between the parties, they have satisfactorily concluded a bargaining process, by means of which they have reached this Agreement, the terms and conditions of which are expressed as follows....

Docket # 66, Ex. G ¶¶ 4 & 5. That is, NSA was involved in the Payco acquisition transaction and even made agreements, in its own name, with the OMA.

Sterling also averred, under oath, that its President, John Williams, met with NSA's officers in Puerto Rico, on many occasions to do discuss NSA's offers to buy its business, which Sterling refused. <u>See</u>, Docket # 66, pp. 9-10; <u>see also</u>, Ex. K. Pp. 1-2.

A review of the aforementioned evidence reveals that NSA's contacts with Puerto Rico are related to the litigation before the Court, as required by the specific jurisdiction constitutional test. The evidentiary documents submitted by the Plaintiff tell that NPR made the offer to buy Payco on behalf of NSA, which supports the conclusion that NPR acted as an agent to NSA in this transaction. We can, and do take into consideration NPR's actions made on behalf of NSA as part of our jurisdictional inquiry. <u>Daynard</u>, 290 F. 3d at 55.("For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal[,] whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct.") Also, as part of the inquiry, we take all of Plaintiff's factual allegations, properly supported by evidence, as true.

The documents provided by the Plaintiff also show that NSA advised NPR during the strategic part of the Payco acquisition and throughout the whole process. During the SPA negotiations NSA was in constant communication with NPR, not only requesting economic data from NPR, but also discussing the potential anticompetitive effects of the transaction. Furthermore, it was NSA who eventually approved the Payco acquisition, and it was a

Civil No. 06-1015(SEC)                                                              13

guarantor to Payco on the SPA agreement. Moreover, NSA made various approaches to Sterling offering to buy its business. Last, but not least, NSA was a party to the agreement with the PR Department of Justice which gave contingent clearance to the Payco acquisition. It is clear beyond peradventure that all these contacts are related to Sterling's allegations that NSA was involved in an aggressive acquisition strategy to monopolize the ice cream distribution market, in violation of the antitrust laws.

Although a contract is only "an intermediate step in a process involving prior negotiations and future consequences... courts have found that participating in significant negotiations within the forum state anent important contract terms can constitute minimum contacts with the state for purposes of a subsequent claim asserting a breach of that contract." 163 Pleasant St., 960 F. 2d at1090. Despite the fact that the claim before the court is not one for breach of contract, the antitrust claim is undoubtedly linked to the SPA agreement, as the Payco acquisition put Nestlé in a very advantageous position over Sterling because of NSA's resulting market share. The Court can safely say that NSA's guaranty to Payco and the commitment it made with the PR Department of Justice to comply with some necessary conditions for the approval of the SPA, are negotiations that were important to the execution of the SPA, which gave rise, along with other actions on NSA's part, to this antitrust claim. We now move on to the next requirement.

*ii. Purposeful availment*

The exercise of personal jurisdiction over an out-of-state defendant as NSA, also requires a showing that it purposefully availed "of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts **foreseeable**." Daynard, 290 F. 3d at 61.(emphasis added). The purposeful availment elements requires a showing of "voluntariness and foreseeability." Id. The abovementioned contacts support a conclusion that NSA voluntarily entered into a transaction within the forum, *i.e.* the Payco acquisition, which, NSA could easily have foreseen might give rise to antitrust litigation before the

Civil No. 06-1015(SEC)                                                        14

Puerto Rico fora. Our conclusion is not farfetched as the documents exchanged between NPR and NSA exhibit their knowledge of, and concern with, the antitrust investigation held by the PR Department of Justice, and Sterling's objection to the transaction all along. Furthermore, NSA, itself, was a party to the agreement with the Department which gave a conditional green light to the transaction. We believe that NSA's contacts with Puerto Rico are of such nature that it should reasonably have anticipated "being haled into court [here]." Ticketmaster v. Alioto, 26 F. 3d 201, 207 (1st Cir. 1994).

     *iii. Reasonableness*

     The last of the requirements for personal jurisdiction to be within the boundaries of due process is that it be, in view of the *Gestalt* factors, reasonable. This is so because "the jurisdictional inquiry is not a mechanical exercise." Id. at 209. Therefore, even when a defendant purposefully availed itself of the forum, and its contacts are related to the litigation, "courts must consider a panoply of other factors which bear upon the fairness of subjecting a nonresident to the authority of a foreign tribunal." Id. The so-called *Gestalt* factors are: (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute. (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. Id. In The premise behind these factors is that "the Due Process Clause bars a court from asserting jurisdiction over the person of a defendant if doing so would be fundamentally unfair." Id. at 210.

     Although we acknowledge NSA's burden in appearing before a Puerto Rico court, when its offices are located in Switzerland, we believe that this burden is minimal when balanced against this forum's interest in adjudicating an antitrust dispute concerning the ice cream distribution market in Puerto Rico and against Plaintiff's interest in obtaining convenient and effective relief. In this analysis we take note of the "traditional deference accorded to a plaintiff's choice of forum, [which] weighs in favor of personal jurisdiction."

**Civil No. 06-1015(SEC)**                                                          **15**
_____

<u>Daynard</u>, 290 F, 3d at 62. In this same line, considering the interests of all sovereigns involved, we find that Switzerland could have only little interest in an antitrust dispute concerning a market within the borders of Puerto Rico.

Finally, we believe that the only way in which the Court may reasonably afford an effective resolution to this controversy, and an effective relief to the Plaintiff, is by bringing all the parties involved to one forum, Puerto Rico.

In light of the above, the Court hereby **DENIES** Nestlé S.A.'s motion to dismiss (Docket # 21, 118 & 132). Because we are denying NSA's motion to dismiss, and because NHI has already been terminated as a party in this case, the Court also **FINDS AS MOOT** their motions requesting a stay of discovery pending the resolution of the motion to dismiss (Dockets # 99 & 123). The Court will issue an order regarding discovery on this same date.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 15th day of April, 2008.

> S/ *Salvador E. Casellas*
> SALVADOR E. CASELLAS
> U.S. Senior District Judge