**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

STERLING MERCHANDISING, INC.

    Plaintiff

             v.                        **Civil No.** 06-1015

NESTLE, S.A., et al.

    Defendants

## OPINION & ORDER

Plaintiff, Sterling Merchandising, Inc. ("Sterling"), brings this action against defendant corporations, Nestlé, S.A., Nestlé Holdings, Inc., Nestlé Puerto Rico, Inc. ("Nestlé PR"), and Payco Foods Corporation ("Payco")(collectively, "Nestlé" or "Defendants"), alleging antitrust violations and injury stemming from the merger of two local ice cream distributors, and several subsequent business practices. The complaint charges Defendants with: conspiracy to monopolize, and unlawful restraint of trade in violation of Sections 1 & 3 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 1, 3; monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, exclusive dealing in violation of Section 3 of the Clayton Antitrust Act ("Clayton Act"), 15 U.S.C. § 14; unlawful restraint of trade in violation of the Puerto Rico Anti-Monopoly Act, 10 P.R. Laws Ann., §§ 257-276; and monopolization and attempted monopolization in violation of Section 260 of the Puerto Rico Anti-Monopoly Act, 10 P.R. Laws. Ann., § 260. Defendants have moved this court for summary judgment on Counts I through VIII of the Amended Complaint, which allege violations of Sherman Act Sections 1, 2, and 3 (15 U.S.C. §§ 1-3), Clayton Act § 3 (15 U.S.C. § 14), and the Puerto Rico Anti-Monopoly Act (10 P.R. Laws Ann. §§ 257-276).

Given the complex nature of the present suit, and after an unsuccessful effort at

mediation, this Court held a special hearing for the parties to further present any relevant arguments regarding the motion currently under review. Docket # 221. Taking into account the arguments presented there, and after reviewing the facts and the pertinent law, summary judgment **DISMISSING WITH PREJUDICE** Sterling´s federal claims shall be **GRANTED**, while all state law causes of action shall be **DISMISSED WITHOUT PREJUDICE**.

### Background[1]

*Relevant Cast*

Sterling is an ice cream distributor, founded by John Williams ("Williams") and Stanley Pasarell ("Pasarell") in 1993. PSUF #1. From its beginnings, the company has had the exclusive rights to distribute Edy's Ice Cream ("Edy´s") in Puerto Rico, a brand manufactured by Dreyer's Grand Ice Cream, Inc. ("Dreyer's"). Id. Williams and Pasarell each own 50% shares in Sterling. DSUF # 11(a)&(b). Williams is President and Pasarell is Chairman of the Board. Id.

Nestlé S.A., headquartered in Vevey, Switzerland, is currently the largest ice cream manufacturer in the world. PSUF # 4. A subsidiary, Nestec S.A., is responsible for the analysis and review of merger, acquisition, and divestiture proposals within the Nestlé corporate structure. DOSUF # 5.  Nestlé S.A. operates in Puerto Rico through separate marketing subsidiaries that sell their products in the market. DSUF # 166. These include Nestlé PR, which owns 100% of the shares of  Payco. DSUF # 2. Dreyer's, manufacturer of Edy's, is also a subsidiary of Nestlé S.A.[2] DSUF # 182.

Thomas Ward ("Ward") was the President and principal owner of Payco until the merger

---

[1]  Accompanying the Motion for Summary Judgment was Defendants' Statement of Uncontested Facts ("DSUF")(Docket # 191), to which Plaintiff replied with its Opposition to Statement of Uncontested Facts ("POSUF")(Docket # 198). Defendants replied (Docket # 208-3), and Plaintiff sur-replied (Docket # 212). Plaintiff also submitted its own Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("PSUF")(Docket # 197), Defendant replied (DOSUF)(Docket 208-33), and Plaintiff sur-replied (Docket # 213).

[2] Dreyer's entered into an agreement in 2002, with an effective date of June 26, 2003, whereby it combined with Nestlé Ice Cream Company, LLC to form Dreyer's Grand Ice Cream Holdings, Inc.

with Nestlé PR in 2003, with the exception of the period between 1999 and 2001. DSUF # 9(a); POSUF # 9(a). However, even during said period, Ward acted as Chief Executive Officer ("CEO") and Chairman of the Board. Id. Valerie Cornut ("Cornut") is currently CEO of Payco, a position she has held since 2005. POSUF # 9(b).

Dr. Thomas Overstreet ("Overstreet") is an economist at CRA International, where he holds the position of Vice President. Sterling retained his services "to conduct an economic analysis of the issues raised in the Complaint filed in this matter." DSUF # 15(a). Sterling's other expert is David W. Whitehouse, a marketing specialist, who conducted two surveys about the ice cream market in Puerto Rico. DSUF # 15 (b).[3] Defendants' experts are David Scheffman, an economist and Director of LECG, LLC, an international consulting company, and José J. Villamil, President and CEO of Estudios Técnicos, Inc., an economics and planning consulting firm in Puerto Rico. DSUF # 16.

Unilever is a major Nestlé competitor in the ice cream business, producing brands such as Breyers and Ben and Jerry's. DSUF # 6. Breyers is distributed by Payco, while Sterling distributes other Unilever products, such as Ben and Jerry's ice cream. See DSUF # 19, DUSF # 17, PSUF #3.

*Market Structure*

Beginning in 2002, Nestlé managers studied and discussed purchasing Payco, along with other strategies within the Puerto Rico market. PSUF # 8. Nestlé also expanded its presence in

---

[3] Defendants have also filed a Motion to Strike the Rebuttal Declaration of Dr. Thomas Overstreet (Docket # 206), which was filed in response to Defendant' Motion for Summary Judgment, and after the window for expert discovery had closed in the case management calendar. Inasmuch as said declaration incorporated sales data produced after his original report was delivered and expounded upon his existing theories, Defendants' motion is **DENIED**. However, the report also includes new theories of liability, including foreclosure in certain sub-segments of the ice cream market, which were presented after the closure of expert discovery. These are an improper attempt to reformulate arguments regarding the relevant market, and shall be struck from the record. The present case is not as extreme as Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 59 (1st. Cir. 2001), which is cited by Defendants. Nevertheless, the new theories regarding sub-regions would require new market definitions and expert work for both parties, and should thus not proceed at this advanced stage.

the world wide ice cream market after 2000, and in 2003 acquired Dreyer's. DSUF # 182.  The Federal Trade Commission ("FTC") investigated and approved Nestlé Holdings, Inc.´s acquisition of Dreyer´s, but did not include Puerto Rico in its analysis. PSUF # 60. The FTC also required Defendants to provide advance written notification of the acquisition of any direct store delivery ice cream distribution business for $7.5 million or more in the United States, except for those in Puerto Rico. PSUF # 61.

Dreyer's products first entered the Puerto Rico market in 1992, and in 1993 the company assigned the exclusive right to distribute its Edy's line to Sterling. DSUF # 176. Sterling has distributed Dreyer's branded products in Puerto Rico since 1993. DSUF # 25. Since as early as April, 2001, Edy's has been, and continues to be, the number one selling ice cream brand in Puerto Rico.[4] DSUF # 26. In August, 2000, Sterling purchased selected assets from Caribbean Fruitti, an ice cream distributor in Puerto Rico, and thereby acquired the distribution rights to certain Unilever brands including Good Humor ice cream products. DSUF # 27. Sterling also added J & J Snacks, Rich's Ice Cream and Turkey Hill products to their offerings between 2005 and 2006. DSUF # 28. The amount and variety of ice cream brands and products offered in the relevant market has not diminished significantly since Nestlé PR's acquisition of Payco.[5] DSUF ## 32–33.

Nestlé PR entered the Puerto Rico ice cream distribution market in 1998 via the

---

[4] This fact was not properly controverted with evidence to the contrary.

[5] Prior to the 2003 merger, the following brands, and possibly others, were available in Puerto Rico: Breyer's, Häägen Dazs, Blue Bunny, M&M Mars (Snickers, Dove, M&Ms), Payco, Flav-o-Rich, various private labels, Healthy Choice, Lady Richmond, Rich & Creamy, Blue Bell, and Carrusel, Nestlé imported range, Edy's, Ben & Jerry's, Unilever (Good Humor), Barbers, Nestlé products; Budget Saver, Tofutti, Natural Fruit Corp, Parmalat – Kinnett, Hood, Schoep's. As of 2008 the market included a similar number of options for the consumer: Breyer's, Häägen Dazs, Nestlé, Nestlé Gold, Nestlé Payaso, Nestlé Nevada, Nestlé impulse products, Dole, M&M Mars (Snickers, Dove, M&Ms), Payco, Flav-o-Rich, various private labels, Healthy Choice, Lady Richmond, Rich & Creamy, Blue Bell, and Carrusel, Edy's, Unilever (Good Humor), Natural Fruit Corp., Rich Ice Cream and Products, Turkey Hill, Schoeps, Ben & Jerry's, Hunter Farms, Budget Saver, J&J Snack, Old Meeting House, Gianni of New York ("Gianni") ice cream, and Gianni Italian ice. Plaintiffs have disputed the presence of Blue Bunny, and the relevance of various limber companies. They have not been included in this Court's analysis.

acquisition of Mantecados Nevada, Inc.'s ("Nevada") ice cream manufacturing and distribution business. DSUF # 21. Prior to the acquisition of a local distributor, Nestlé PR sold its branded ice cream products, mostly imported from the U.S. mainland, via local distributors, including Sterling, Payco, and Nevada. PSUF # 9.  Nevada ran an ice cream factory in addition to its distribution business, so Nestlé PR offered ice cream products that were manufactured in the Puerto Rico factory, as well as Nestlé branded products. PSUF # 10. The company's ice cream sales volume in this period (1999-2001) fluctuated between $18.1 million and $ 18.6 million. PSUF # 11. Nearly contemporaneously, Payco reported sales of $27.8 million, $29.1 million, and $31.1 million in 2000, 2001 and 2002, respectively. PSUF # 15.

From the time of the 1998 Nevada acquisition until the Payco merger in June 2003, Nestlé PR's ice cream division suffered heavy losses. DSUF # 22.  In response to this reality, and before the 2003 merger with Payco, Nestlé PR approached Sterling about a possible joint approach for retail space, but this option was never seriously pursued. PSUF # 155. This did not lead to an agreement, and because Nestlé PR was not economically successful, it began merger talks with Payco in 2001, and the two merged on June 11, or July 1, 2003 through Nestlé´s acquisition of 50% of Payco's stock, which was controlled by Ward.[6] DSUF ## 23 & 209; PSUF ## 22 & 27. On September 2, 2005, Nestlé PR acquired the remaining 50% of Payco's shares from Ward. DSUF # 210. After the Nestlé PR/Payco merger, Ward remained as President and CEO of Payco until 2005. PSUF # 53.

---

[6]Plaintiffs allege that the motivation for this merger was ". . . that Nestlé executives responsible for investigating and approving the acquisition of Payco intended to monopolize ice cream distribution business in Puerto Rico and exclude or limit competitors such as Sterling, Unilever and Wells Dairy." POSUF # 23. Contemporaneous to this merger, between 2002 and 2005, Sterling and Nestlé management discussed different possibilities for merger, purchase, or the sharing of distribution rights. DSUF ## 203-208.  No agreement was ever reached.  Part of Nestlé P.R.´s pre merger difficulties were due to Payco´s distribution network."As Nestlé recognized that continued competition with Payco would likely lead to further losses, acquiring Payco became an attractive option," because the local company controlled the best locations and key distribution channels. PSUF ## 24 & 28. Furthermore, this Court notes that the exact date of the merger is contested, but finds said fact to be immaterial for present purposes.

The Puerto Rico Office of Monopolistic Affairs ("PROMA") reviewed and ultimately approved the Nestlé PR / Payco transaction, conditioned upon various stipulations.[7] DSUF # 30. The then head of PROMA, José Díaz Tejera, has no knowledge that the terms of the agreement have ever been breached. DUSF # 31. After the merger, all of the sales of ice cream that were previously made by Nestlé PR, including all Nestlé brands, were shifted to Payco. DSUF # 214.

During the years prior to the Nestle PR/Payco merger, Nestlé explored the possibility of strategic collaboration, and even a possible merger with Sterling. PSUF # 51. Nestlé also studied the possibility of exchanging its Unilever line for Sterling´s Edy´s line in order to promote brand alliance rationalization. PSUF ## 86 & 90. This included discussions with Sterling´s co-owner, Pasarell, about the possible purchase of his share of the company. PSUF # 88.

In the mid-1990s, Ward acquired Payco and began distributing various brands of ice cream. These came to include Payco, Lady Richmond, Carrusel, Flav-O-Rich,  Unilever's Breyer's ice cream line, Masterfood Interamerica's Mars novelty ice cream line, and Wells' Dairy, Inc.'s  ("Wells' Dairy") Blue Bunny line of ice cream products. DSUF ## 17-20; PSUF # 13.  Prior to the Nestlé PR / Payco merger in 2003, Blue Bunny ice cream products were Payco's most successful ice cream line. DSUF # 36. The merger caused Wells' Dairy to terminate its distributor agreement with Payco, because Payco started to distribute two of Blue Bunny ice cream's main competitors, Breyers and Nestlé Gold. DSUF ## 36-37. Before Blue

---

[7]

   PROMA staff expressed concern about the transaction's potential anti-competitive effects. PSUF # 46. Plaintiffs dispute this fact, however, their objections are centered on the merits of the decision, and not its existence. PROMA staff noted that the Payco/Nestlé PR combination could create restrictions on competition, but the transaction was eventually approved, in part due to the fact that the Commonwealth wanted Nestlé to continue operating its local ice cream factory. POSUF # 30. The approval was made official on March 25, 2003(DSUF # 223), and  stipulated that Nestlé PR and Payco would not enter into exclusive contracts which closed more than 35% of the market to competition. DSUF # 224. Nestlé P.R. also agreed that it would seek PROMA's approval before granting the distribution rights over Edy's ice cream, unless Sterling should acquire the distribution rights to either Breyer's or Blue Bunny ice cream (or any other brand with similar sales). PSUF # 49. PROMA defined the relevant market as dedicated to the distribution and sale of ice cream. PSUF # 47.

Bunny terminated its distribution agreement with Payco, it was at one time available in approximately 80 percent of stores selling take home ice cream in Puerto Rico. PSUF # 65. Wells' Dairy then granted a newly formed distributor, Palm Industries, Inc. ("Palm"), the right to distribute Blue Bunny ice cream products in Puerto Rico. DSUF # 38. Palm only survived until 2006, when Wells' Dairy formed a subsidiary in Puerto Rico, Wells' Dairy Puerto Rico, to self-distribute Blue Bunny take home products. DSUF # 38. On October 8, 2008, Wells Dairy informed Puerto Rico retailers that it would cease distributing Blue Bunny branded ice cream and novelty products no later than December 15, 2009. DSUF # 45.

After the 2003 Nestlé PR/Payco merger there was analysis of whether Unilever would continue to provide Payco with some of its products, such as Breyer's ice cream. In undertaking this analysis, Unilever considered factors such as the reality that Defendants, by acquiring Dreyer's and Payco, became its distributor and also main competitor. Nevertheless, Breyer's was concerned that switching to Sterling could result in litigation due to breach of contract, and also the potential difficulties of single-brand self-distribution. PSUF # 113. After weighing its options, Unilever decided to stay with Payco, and in early 2006, entered into a new agreement with Nestlé PR/Payco by which the company was appointed as the exclusive distributor of Unilever's Breyers as well as Good Humor brand packaged ice cream products in Puerto Rico.[8] PSUF ## 116 & 117.

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56

---

[8] Sterling alleges that Breyer's sales have stagnated as a result of the agreement, but this fact is in controversy, and not centrally relevant to the present motion.

1    **Civil No. 06-1015(SEC)**

2    (c); See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248(1986); Ramírez Rodríguez v.

3    Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005).   In reaching such a determination, the

4    Court may not weigh the evidence.  Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42

5    F.3d 668 (1st Cir. 1994).  At this stage, the court examines the record in the "light most favorable

6    to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-

7    Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

8        Once the movant has averred that there is an absence of evidence to support the

9    nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least

10   one fact in issue that is both genuine and material.  Garside v. Osco Drug, Inc., 895 F.2d 46, 48

11   (1st Cir. 1990) (citations omitted).  "A factual issue is 'genuine' if 'it may reasonably be resolved

12   in favor of either party and, therefore, requires the finder of fact to make 'a choice between the

13   parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st

14   Cir. 2005) (citing Garside, 895 F.2d at 48 (1st Cir. 1990)).

15        In order to defeat summary judgment, the opposing party may not rest on conclusory

16   allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough,

17   407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d

18   5, 8 (1st Cir. 1990).  Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a

19   genuine issue of material fact.  Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).  Once the

20   party moving for summary judgment has established an absence of material facts in dispute, and

21   that he or she is entitled to judgment as a matter of law, the 'party opposing summary judgment

22   must present definite, competent evidence to rebut the motion.'  Méndez-Laboy v. Abbot Lab.,

23   424 F.3d 35, 37 (1st Cir. 2005) (quoting Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576,

24   581 (1st Cir. 1994).  "The non-movant must 'produce specific facts, in suitable evidentiary form'

25   sufficient to limn a trial-worthy issue. [. . .]  Failure to do so allows the summary judgment

26                                    Page  8

**Civil No. 06-1015(SEC)**

engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8, quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve.").

**Applicable Law & Analysis**

*Relevant Market*

There are three retail distribution channels in the ice cream market 1) take-home, 2) impulse (single-serving packages sold for immediate consumption), and 3) food service customers (restaurants, hotels, ice cream parlors, etc.). PSMF # 189. The market shares of said distribution channels are approximately two thirds take-home, and one fourth impulse, with the remainder being food service customers, who make up less than one tenth of total ice cream consumption.[9]

Sterling has presented the relevant product market as the Puerto Rico market for the distribution and sale of ice cream products. DSUF # 46. PROMA also defined the relevant product market as the distribution of ice cream products, including the three segments in its definition.[10] POSUF # 47. Defendants have not offered a competing definition. Id. Moreover, Sterling's definition of the relevant geographic market, Puerto Rico, is unchallenged. Defendants' expert has not attempted to create a counter theory regarding the relevant product

---

[9]This Court notes that Plaintiff posits its relevant market as the combination of these three segments.

[10]This conclusion is buttressed by *practical idicia* used by Overstreet, Plaintiff's expert. Internal Nestlé documents refer to its competitors as Sterling, and Palm industries, excluding ice cream retailers. Accordingly, Sterling's expert determined that the data was not amenable to econometric analysis. Id.

**Civil No. 06-1015(SEC)**

market. POSUF # 48; PSUF # 187.

Instead, Defendants signal that Sterling failed to include many important ice cream vendors in its relevant market definition, these include Baskin-Robbins[11] (DSUF ## 66-70), McDonald's (DSUF # 71-74), and "limbers,"[12] a Puerto Rican version of the popsicle (DSUF ## 75-78). However, Defendants' own internal documents identify Sterling and Wells/Palm as principal competitors, and do not identify McDonald's, Baskin Robbins, or other retailers as part of the competitive landscape. POSUF # 58; DSUF # 58.

Defendants also criticize Sterling for not performing an econometric cross-elasticity of demand calculation to support its product market definition. Docket ## 47-48. They claim that Sterling has not performed an analysis of the reasonable interchangeability of use between products, or a price study, that are alleged to be part of the relevant market and potential substitutes. DSUF ## 49 & 52. Sterling does not deny that its expert ". . . has not produced econometric or regression computations relating specifically to cross-elasticity, but Plaintiff disputes Defendants' statement or implication that Plaintiff has not conducted an in-depth economic analysis concerning the characteristics and firms in the relevant product and geographic market." POSUF # 48.

The **rule of reason** governs this Court's analysis of the relevant market. <u>Recetas Por Menos, Inc. V. Five Development Corp.</u>, 368 F.Supp. 2d 124, 132 (D.P.R. 2005). When proving monopoly through indirect evidence, a market power analysis requires the prior identification of the relevant market, which is bifurcated into a test regarding the relevant product market and another focusing on the relevant geographic market. <u>Id.</u> at 131; <u>Eastern Food Services, Inc. v. Pontifical Catholic University Services Assn</u>, 357 F.3d 1, 5-6 (1st Cir. 2004). Because

---

[11] Baskin-Robbins distributed to a limited number of grocery stores at one point, but has since terminated this facet of its business. POSUF # 68.

[12] The name comes from a visit to the Island by Charles Lindbergh in the 1920s.

**Civil No. 06-1015(SEC)**

Defendants do not contest Sterling's assertion that the relevant geographic market is the entire geographic territory of Puerto Rico, this Court will accept Sterling's definition for the purpose of all further analysis. However, Defendants' objection to Plaintiff's market definition requires this Court's review.

Supreme Court case law establishes that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. U.S., 370 U.S. 294, 325, 82 S.Ct. 1502, 1524 (1962); see also Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 307 (3rd Cir. 2007). This analysis concerns the fact that the ". . .ability of customers to turn to other suppliers restrains a firm from raising prices above the competitive level, [so] the definition of the relevant market rests on a determination of available substitutes." Federal Trade Comn v. Cardinal Health, Inc., 12 F.Supp. 2d 34, 46 (D.D.C. 1998). To wit, the competing products that customers in the market view as substitutes for the product in question. Id. Accordingly, the central question is whether there are reasonable alternatives to the product in question.

In addition to this first test, a practical, fact-driven, approach may also guide a court's analysis as to, "[t]he boundaries of [. . .] submarket[s], [which] may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the products' peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe Co., 370 U.S. at 325. This entails taking into consideration the economic and commercial realities of a particular industry. Cardinal Health, 12 F.Supp. 2d at 46. Failure to define this market may lead to the dismissal of the anti-trust complaint. Broadcom, 501 F.3d at 307.

Sterling alleges that the market in question is a secondary market for the distribution and sale of ice cream, which is a market for distribution services and wholesale marketing to

**Civil No. 06-1015(SEC)**

intermediaries, and not for the sale of ice cream directly to its end consumers. Defendants contest

that ice cream retailers are direct competitors for their business, and that excluding retailers from

the relevant market definition is a fatal flaw on Sterling's part. They argue that if the price of

Edy's, or another similar brand, were to rise sufficiently at a supermarket or impulse location,

consumers would migrate to retail firms such as McDonald's and Baskin-Robbins.

Whether one examines a sub-market, or a separate market for services, Sterling's

arguments prevail on this point, at least so far as a genuine dispute of material fact exists.  It is

telling that during the relevant period, all of the companies involved have engaged in practically

the same economic activity, which is importing ice cream into Puerto Rico and distributing it to

supermarkets, restaurants, and impulse locations. None of the parties engages in significant retail

activity,[13] and they mutually consider each other to be their primary competitors. It is doubtful

that another unmentioned group of existing sellers and producers in the relevant geographic

market could have, during the pendency of this action, deprived the parties in this complaint of

significant amounts of business. Newcal Instustries, Inc., 513 F.3d at 1045. While Defendants

allege that firms such as McDonald's and Baskin-Robbins should be included in the ice cream

market, their internal business communications belie the relevance of the retail ice cream market

for Sterling and Nestlé/Payco's operations. The consumers in this market are the retailers, not

the end customers for the product.

This Court understands that the parties involved in the lawsuit provide a specific service

that is distinguishable from the business of selling ice cream directly to consumers. Furthermore,

even if the relevant market includes competitors such as Baskin-Robbins and McDonald's, there

is most certainly a dispute of fact as to the existence of a submarket. Newcal Instustries, Inc. v.

---

[13] The "limber" companies could be different, but Defendants have not presented evidence that "limber" distribution has had anything but a *de minimis* effect on the ice cream distribution market.

**Civil No. 06-1015(SEC)**

Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008). Therefore, Defendants' prayer for summary judgment dismissing all claims for failure to properly define the relevant product market is **DENIED**.

*Antitrust Injury*

Sterling alleges damages on two main fronts. First it avers that Nestlé PR/Payco's exclusive contracts with some Puerto Rico retailers have illegally restricted them from enjoying a market share commensurate with their products' performance in competitive scenarios. Secondly, Nestlé allegedly coordinated a "price squeeze" and restricted product support for Dreyer´s products that Sterling distributes (*i.e.* Edy's). The Nestlé PR/Payco merger allegedly led to ". . . a panoply of anti-competitive conduct including price increases to Sterling, denial of new products, and so forth." Docket # 198.  Sterling argues that "but for" these activities, it would have achieved greatly higher sales, and enjoyed the profits these sales would have produced.

Specific antitrust standing is dependent on Sterling being able to show a plausible antitrust injury, ". . . linked to an illegal presence in the market[,] . . . which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). The injury must originate in proscribed anti-competitive activity, "by reason of that which made the [activity] unlawful," id. at 488, and it must also be sufficiently direct, non-speculative, and measurable to the extent that causality is not in doubt. Associated Gen. Contractors of Cal., Inc., v. Cal. State Council of Carpenters, 459 U.S. 533, 102 S.Ct. 8907, 906 (1983).

The need for direct causality born from a specific anti-competitive act is of special importance, because "antitrust claims are concerned not with wrongs directed against the private

**Civil No. 06-1015(SEC)**

interest of an individual business but with conduct that stifles competition." <u>E. Food Servs.</u>, 357 F.3d at 4 (citing <u>Brown Shoe Co.</u>, 370 U.S. at 344). Antitrust ". . . harm does not mean a simple loss of business or even the demise of a competitor but an impairment of the competitive structure of the market." <u>Recetas Por Menos, Inc.</u>, 368 F.Supp. 2d at 132 (citing <u>Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.</u>, 373 F.3d 57 (1st Cir. 2004)); <u>see also</u> <u>Brown Shoe Co.</u>, 370 U.S. at 344. In sum, federal antitrust law seeks "the protection of competition, not competitors." <u>Leegin Creative Leather Products Inc. V. PSKS, Inc.</u>, 551 U.S. 877, 906, 127 S.Ct. 2705, 2724 (2007)(citing <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)); <u>see also</u> <u>Specturm Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 458, 113 S.Ct. 884, 891 (1993).

The law does not require that the illegal activity be the sole cause of the injury, "but only that it was a material cause." <u>Sullivan v. National Football League</u>, 34 F.3d 1091, 1103 (1st Cir. 1994)(citing <u>Engine Specialties, Inc. v. Bombardier Ltd.</u>, 605 F.2d 1, 14 (1st Cir. 1979)). Furthermore, the First Circuit's standard includes "but-for causation," leading to a direct injury resulting from anti-competitive activity. <u>Morales-Villalobos v. Garcia-Llorens</u>, 316 F.3d 51, 55 (1st Cir. 2003); <u>see also</u> <u>SAS of P.R., Inc. v. P.R. Tel. Co.</u>, 48 F.3d 39, 43 (1st Cir. 1995).

The Sterling damages model asks this Court to assume that "but for" the Nestlé PR/Payco merger, the company would have had more than double the market share it had in 2003, when the period of Defendants' alleged anti-competitive and monopolistic actions began. Overstreet's damages model assumes that Sterling's sales accounted for roughly 50% of Supermax and Pueblo ice cream volume, and uses this volume as a benchmark.[14] DSUF # 234. It concludes that Sterling could have enjoyed up to a 50% market share, "but for" Payco's allegedly anti-

---

[14] Sterling's expert accepted on its face the report of the company's executives that Sterling's sales accounted for the ice cream volume in SuperMax and Pueblo stores. DSUF # 235.

**Civil No. 06-1015(SEC)**

competitive exclusivity agreements. DSUF # 230. Another benchmark used are depot center sales, of which Sterling alleges it enjoys 50% market share, and Walmart, which does not use exclusives, where Sterling enjoys 42% market share. DSUF ## 226-231.

Consistent with Plaintiff's theory of the case, its expert, Overstreet affirms that none of the ice cream distributors in Puerto Rico had market power prior to the summer of 2003, and before said date the market was competitive. DSUF ## 79 & 80.  Overstreet, concedes that Payco, Nestlé PR, Wells', Sterling and Dreyer's did not have monopoly or unilateral market power prior to the Nestlé PR/Payco merger. DSUF # 144.  If the base-line for a competitive environment in the ice cream market was the pre-merger  landscape (see DSUF ## 79 & 80, 144), then Sterling should have to show how it was harmed, and how "but for" the merger and the alleged illegal activity, it would have achieved, through legitimate competition, greater sales, market share, profits, etc.

The primary reality undermining Sterling's request for "but for" damages, is that the inference that the company has been unfairly hindered either by the exclusives or by product price increases is implausible in light of Sterling's increased profits, sales, and market share. Far from showing that the merger hurt their business, the record shows that Plaintiff was **better off** during the relevant period.

Despite the allegedly competitive marketplace, between fiscal years 2001 and 2003, Sterling's sales **declined from** $8.07 million to $ 7.01 million. DSUF # 90.  However, after the Nestlé PR/Payco merger, Sterling's sales **increased**, expanding to $12.02 million by the end of 2008, a 70% **increase** over the company's 2003 results. DSUF # 90.  By contrast, some products distributed by Nestlé PR/Payco lost market share and access to important locations. See, e.g., DSUF ## 119, 134, & 139

The same trend is observable in Sterling's gross profit, which rose by an annual rate of

**Civil No. 06-1015(SEC)**

12% between 2003 and 2008, and during which time its operating income **increased** by 300%. In 2007, Sterling's gross profit was 60% **higher** than in 2003. DSUF # 93.  Moreover, Sterling's market share grew, from approximately 12.6% in 2002 to 20.7 % in 2007, and the company is expanding its ice cream distribution operations by building new and larger facilities.[15] DSUF ## 96-97 & 100; PSUF # 196. In contrast, the Nestlé PR/Payco joint venture **lost** nearly $5 million in sales revenue to Sterling and other competitors in its first six months of operations. DSUF # 139.

Regarding the market as a whole, Puerto Rico's ice cream distribution industry has grown in terms of total sales since 2003. DSUF # 98. There is insufficient data in the record of the case to evaluate how much Puerto Rico consumers paid at the retail level before the 2003 Nestlé PR/Payco merger, and whether during the pre-merger period price increases to consumers were greater than or less than the rate of inflation, and supplier price increases.[16] DSUF ## 82-85. What the record does show is that inflation in Puerto Rico averaged 11.9% annually between 2003 and 2007, encompassing the relevant period for this action. DSUF # 87.  Despite this, both Blue Bunny and Edy's ice cream retailed for **lower** prices in 2007 than in 2001. DSUF # 141.

Furthermore, Sterling alleges that exclusivity contracts between Defendants and many Puerto Rico retailers after the Nestlé PR/Payco merger caused it antitrust injury.  However, exclusive contracts have been used in the Puerto Rico ice cream business since the 1990s. DSUF # 113.  Payco's sales of ice cream to exclusive accounts **decreased** from $15.16 million in 2004 to $10.62 million in 2007. DSUF # 116.  Sterling's internal documents show that Payco's

---

[15] For much of the relevant period, Sterling  did not carry  "cheap and sweet" ice cream lines, which are an important seller at many supermarkets catering to lower income customer bases. DUSF ## 102-104. Furthermore, an important customer, Unilever, complained that Sterling does not have specific routes for impulse, single serving, ice cream sales. DSUF # 110. These factors may have limited Sterling´s growth *vis a vis* Nestlé PR/Payco.

[16] Sterling responds to this fact with an affidavit by one of its lawyers of a review of advertised prices. POSUF # 84. However, this Court finds said evidence insufficient to controvert these facts.

**Civil No. 06-1015(SEC)**

exclusive accounts foreclosed 28.2% of the Puerto Rico ice cream market in 2004, 30.8% in 2005, 29.4% in 2006, and 19.5% in 2007. DSUF # 118. Moreover, these exclusive contracts were at the distribution level, and not directed at consumers. DSUF # 127. Defendants' 100% exclusive agreements are virtually all one or two years in duration.[17] Docket # 128. Additionally, Overstreet did not find any evidence that Defendants ever sold ice cream products at prices below their cost. DSUF # 142.

Nevertheless, it is not contested that Defendants' gross margins were higher in stores with exclusivity agreements. PSUF # 158.After the merger, Sterling managed to move into various supermarkets that had previously been covered by Payco exclusives. DSUF # 129. These stores included Grande and Pitusa supermarkets, and, in 2007, Sterling also obtained a 30% exclusive agreement with Econo stores, which had previously been a Nestle PR/Payco exclusive retailer. DSUF ## 132 & 133.

In terms of other competitors, Nestlé PR/Payco distributes Unilever's Breyers brand to most retailers, but Econo and military bases receive the brand through other routes. DSUF ## 150-151. Matosantos Commercial Co. distributed Baskin Robins to Supermercados Grande, but stopped doing so in 2007. DSUF # 157. At the end of 2008, Gianni of New York ("Gianni"), an ice cream and Italian ice distributor entered the Puerto Rico market, distributing to various supermarkets. DSUF # 160.

If the market place was competitive when Payco alone utilized exclusives, why should the same practice, at very similar levels, somehow injure Plaintiff now that Payco and Nestle PR have merged? Exclusives have existed in the Puerto Rico marketplace since before the merger,

---

[17] A small number of Payco's agreements surpassed two years, including those with Mr. Special, Supermax, and Blockbuster that were for three years. See Docket # 191-88 at 30-33. Sterling points out Payco's 5 year deal with Ralph's as an example of an illegally long contract, but this was not 100% exclusive. Id. at 30. Plaintiff admits that it was 90% exclusive. POSUF # 211. Additionally, Plaintiff alleges that Payco and Nestlé PR colluded regarding the terms of the Ralph's agreement about the payment terms to the supermarket chain. Id.

**Civil No. 06-1015(SEC)**

and have not increased as a total percentage of market share since 2003.  Beyond the fact that exclusive dealing is not *per se* illegal, and that in the present case Defendants' contracts have not violated the law, as will be discussed further below in Section II, the pre-existence of the practice prior to the merger weakens any claim for antitrust injury.

While Sterling's business concerns regarding Defendants' acquisition of Dreyer's, who manufactures its marquee product (Edy's), are legitimate from a business point of view, they do not involve any overt anti-competitive act. To wit, the acquisition was approved by the FTC (PSUF # 60), and Defendants have not withdrawn Edy's, nor have they significantly increased the unit price to Sterling. DSUF # 87.  Accordingly, prices to consumers have stayed stable and volume of sales has increased, strongly suggesting that the competitive structure of the market has not been harmed, thus precluding antitrust injury.

Furthermore, allegations regarding price increases, along with the non-assignment of some product lines (*i.e.* Skinny Cow), also cannot be linked to tangible damages. The facts of the case show that Sterling's business was not in rapid expansion before the merger (DSUF # 90), nor did it appear to be in a position to dominate the local market. After the merger, however, Sterling's sales grew by 70% (see DSUF # 90), and its market share grew from the low teens to over 20% during the relevant period.  More importantly, the company's gross profit increased by 60% (DSUF ## 96-97), and it has not faced significant increases in its input costs for the products it purchases from Dreyer's. (DSUF ## 82-85 & 141). This expansion has been made possible through aggressive price competition and the successful entry into new retail outlets, previously controlled by Payco in the pre-merger period and then by Defendants during the relevant period for this action. See, *e.g.*, DUSF # 129.

Sterling argues that the benchmark that should be used are those stores where no exclusives are in place, namely Walmart and depot centers, where they have achieved between

**Civil No. 06-1015(SEC)**

40% and 50% sales shares. This Court finds the suggested benchmark speculative for various reasons. Foremost is that exclusive dealing contracts are not illegal *per se*, and it is not reasonable to completely exclude their existence from the market when envisioning a competitive marketplace. Moreover, in the pre-merger period Sterling's market share was nowhere near this large, and it is unrealistic to posit that the company's sales and market presence would have grown four-fold had the Nestle PR/Payco merger never occurred.

Proving antitrust injury requires establishing a causal relationship between an illegal, anti-competitive act and actual damages, or at minimum plausible "but for" damages. This Court finds that Plaintiff has failed to present facts supporting a plausible theory of damages. As a result, Plaintiff's damages model is too speculative and improbable to survive summary judgment.

This holding alone would support dismissal of all of Plaintiff's federal antitrust claims. However, for the purpose of thoroughness, we will discuss each cause of action individually. The discussion will address Plaintiff's three factual groupings of claims. Namely:

    I.    Plaintiff's first and fourth causes of action for Unlawful Restraint of Trade in Violation of Sections 1 & 3 of the Sherman Act and Exclusive Dealing in Violation of Section 3 of the Clayton Act.

    II.    Plaintiff's second and third causes of action for Monopolization and Attempted Monopolization under Section 2 of the Sherman Act.

    III.    Plaintiff's fifth cause of action for Conspiracy to Monopolize in Violation of Sections 1 and 3 of the Sherman Act.

    IV.    Plaintiff's sixth, seventh, and eighth causes action, and Defendant's Counterclaim, brought under Commonwealth Antimonopoly law.

**Civil No. 06-1015(SEC)**

*I. Unlawful Restraint of Trade (Causes of Action I and IV: Sherman Act Section 1; Clayton Act Section 3)*

The central component of Sterling's claims for unlawful restraint of trade under Section 1 of the Sherman Act and Section 3 of the Clayton Act are Defendants' exclusivity agreements with some Puerto Rico retailers. Section 3 of the Clayton Act prohibits arrangements that have a probability to ". . . substantially lessen competition or tend to create a monopoly in any line of commerce." 18 U.S.C. § 15. Likewise, Section 1 of the Sherman Act requires a similar, but subtly different showing, that ". . . the alleged agreement involved the exercise of power in a relevant economic market, that this exercise had anti-competitive consequences, and that those detriments outweighed efficiencies or other economic benefits. This is the rule of reason calculus." Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island, 373 F.3d 57, 61 (1st Cir. 2004).

Sterling's claims for unlawful restraint of trade, and illegal exclusive dealing, are focused on contracts between Defendants and retailers for the exclusive use of freezer space in Puerto Rico stores and supermarkets.  The Amended Complaint alleges that this practice has foreclosed, or cut off,  a sufficient portion of the relevant market from the entrance of new competitors, violating antitrust law, and stifling meaningful competition. However, because the Amended Complaint has not alleged that the exclusive dealing arrangements in question (i.e. the "exclusives") are *per se* violations, this Court must balance the efficiencies gained by their implementation and contrast these with any harm to the structure of the market place. Id. at 62 (citing Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961)).

**Civil No. 06-1015(SEC)**

Section 1 of the Sherman Act requires substantial foreclosure. Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1059 (8th Cir. 2000).  A similar analysis applies to exclusive dealing claims under Section 3 of the Clayton Act.  In other words, some instances of limited foreclosure may be acceptable,  and an antitrust plaintiff must show that the exclusivity has "anti-competitive effects outweighing the legitimate economic advantages that it might provide." Eastern, 357 F.3d at 5.  Harm to competition requires that the practice ". . . create or enhance market power - meaning the power to control prices or exclude competition . . . ," but market power is not in itself sufficient to "condemn the conduct" because potential benefits must also be weighed. Id. Therefore, when analyzing a practice, which is not *per se* illegal, under the rule of reason the courts must consider ". . . both a practice's likely anti-competitive effects and its beneficial business justifications."  Leegin Creative, 551 U.S. at 909.

Case law has established that exclusivity agreements can promote reduced-costs, stable long-term supply, and "predictable prices," and as such  are to be reviewed favorably. Stop & Shop, 373 F.3d  at 66; see also Eastern, 357 F.3d at 8 (elaborating "it is widely recognized that in many circumstances [exclusivity contracts] may be highly efficient - to assure supply, price stability, outlets, investment, best efforts or the like-and pose no competitive threat at all."). Accordingly, given the tendency to liberally review "exclusives," for them to be found illegal, they must have harmed the  very structure of the relevant market, and not competitors or competing interests.   This determination is made by examining if they have foreclosed  a sufficiently large, or crucial, part of the market to effectively block competitors from entering or expanding to compete for new business.

**Civil No. 06-1015(SEC)**

First Circuit case law uses market share figures as initial guides for determining if foreclosure rates are facially dubious or presumably harmless, but a significant share is only a presumptive signal of market power as entry barriers may be low. <u>Eastern</u>, 357 F.3d at 6. The inference of market power requires an antitrust plaintiff to "plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect that market." <u>Broadcom</u>, 401 F.3d at 307. In the case at bar, Plaintiff challenges the levels of foreclosure caused by Nestlé PR/Payco exclusives, which are ". . . unlikely to be of concern when they are less than 30 or 40 percent" of the market." <u>Stop & Shop</u>, 373 F.3d at 68.   In other words, "low numbers make dismissal easy," but high numbers do not guarantee success for a plaintiff. <u>Id.</u> (citing <u>Jefferson Parish Hospital District No. 2 v. Hyde</u>, 466 U.S. 2, 45-46 (1984); Areeda & Hovenkamp, Federal Antitrust Policy, The Law of Competition and Its Practice, 3d).  Beyond First Circuit case law, PROMA's decision approving the Nestle PR/Payco merger echoes this threshold rule by proffering a 35% market share as the highest possible permissible limit for foreclosure due to the Nestlé PR/Payco exclusives.  This limit has never been exceeded on a Puerto Rico wide basis. DSUF # 118-119.

In the present case, sales from stores participating in Nestlé PR/Payco exclusivity agreements have never exceed 30.8% of total market share and averaged just under 27% for the relevant period, **dropping** to under 20% for the final year. This fact weighs strongly in favor of Defendants because, as previously stated, ". . . foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent."[18] <u>Stop & Shop</u>, 373 F.3d at 68. These numbers are below the range of concern, and should not be considered anti-competitive.  However, beyond

---

[18]In fact, PROMA's guidelines would have allowed Nestlé/Payco exclusive to have constituted up to 35% of the relevant market.

**Civil No. 06-1015(SEC)**

this threshold approach, the practices underlying the abovementioned foreclosure percentages

predate the Nestlé PR/Payco merger, and have actually **decreased** since said merger.

In the post-merger period, the percentage of supermarkets covered by exclusives did not

increase, and both Sterling´s market share and total sales have grown. Presently, a Sterling brand,

Edy's, is Puerto Rico's number one brand of ice cream. Sterling has also managed to enter (and

establish preeminence with its Edy's brand)  major Puerto Rico supermarkets, such as Grande,

Pitusa, and Econo, where Defendants' brands had previously enjoyed exclusivity. DUSF # 129.

Sterling's inroads into new Puerto Rico retailers are not isolated instances of competitive success

in the ice cream market. Gianni products also entered various important supermarket chains since

2007, and have maintained their presence to date. In fact, Nestlé PR/Payco's combined market

share is currently **lower** than in the pre-merger period.[19]

In responding to the Motion for Summary Judgment, Sterling points to higher than

acceptable foreclosure rates in some sub-regions of the Commonwealth. The argument is specious

as the market Plaintiff defined for purposes of the present suit is the sale and distribution of ice-

cream in all of Puerto Rico. Analyzing sub-regions or sub-markets would call for not only local

data supporting individual claims for each region and market, but also fragmenting Plaintiff's

broad claims into many market-specific ones.  In addition, Plaintiff also makes arguments about

foreclosure rates in take-home sales of ice cream (see PSUF # 203 (citing that these could have

been as high as 36% during the  relevant period)), but these too are misplaced as they do not

---

[19]Even accepting *arguendo* that said agreements could be construed as illegal, the entry of Gianni, coupled with Sterling's strong growth, clearly suggest the competitive structure of the market has not been impaired, and the market appears to have equal or greater competitiveness than it did prior to the 2003 merger. It is therefore impossible for this Court to infer "but for" damages, where their calculation, even in the light most favorable to Sterling, "would 'necessitate wide ranging' speculation." Sullivan v. Tagliabue, 25 F.3d 43, 51 (1st Cir. 1991).  The rule of reason does not permit an inference that Sterling has experienced real anti-competitive prejudice, and would have been any more or less successful had these agreements not existed.

**Civil No. 06-1015(SEC)**

address the relevant antitrust market. The problem with Plaintiff's analysis regarding take-home sales is not the veracity of the data they proffer; rather it is that their data describes markets beyond the scope of this case.

By agreeing with Plaintiff that the correct relevant market is the sale and distribution of ice cream in Puerto Rico, this Court precludes itself from making conclusions about antitrust violations in sub-markets, not properly established in the four corners of the complaint. Other courts have rejected similar gerrymandering of markets attempting to artificially show high levels of foreclosure. See Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3rd Cir. 1997). The Amended Complaint is not framed to include sub-regions or sub-markets, and it is therefore unnecessary to examine foreclosure rates outside those of the already defined relevant market. Doing so would lead to false analogies and unsubstantiated conclusions.

As mentioned above, exclusive dealing is only considered a threat to competition in "very discrete circumstances," mostly concerning long-term foreclosure (*i.e.* contracts for longer than two years). Eastern, 357 F.3d at 8. Even given market concentration, if the exclusionary contracts are short-term in nature, or entrance is easy, substantial foreclosure cannot be demonstrated. Id. at 8-9.

The tradition of exclusive dealing contracts in Puerto Rico ice cream distribution dates to at least the 1990s, and the undisputed facts reveal that the present levels are well below their pre-Nestlé PR/Payco merger peak. In this context, low market-wide rates of foreclosure are sufficient for this Court to sustain the legality of the exclusives. Nevertheless, the record also reflects that most of the exclusivity agreements in question were for periods of between one and two years. The First Circuit has found that agreements of this length are lawful, because any possible interruption to competition that they might cause is only for a short period after which

**Civil No. 06-1015(SEC)**

competitors may gain entry to foreclosed outlets. <u>Barry Wright Corp. v. ITT Grinnell Corp.</u>, 724 F.2d 227. 236-238 (1st Cir. 1983). This Court notes a small number of the exclusivity agreements are for more than three years. <u>See</u> Docket # 191-88 & 200-8 - 200-13. Nevertheless, these do not constitute a sufficient portion of the relevant market to sustain an antitrust claim.

Of course, this Court agrees with Plaintiff that there is no automatic percentage where market foreclosure rates either ratify the legality of exclusivity agreements or make them *per se* illegal. The law does not seek to immunize potentially illegal activity in restraint of trade, but exclusive dealing contracts are not disfavored, and the present case demonstrates no substantial harm to the market

Arguing against the low foreclosure rates' significance, Sterling repeatedly urges this Court to examine the practical effects of the exclusives, and not a more bright-line approach, and mentions various barriers to entry,[20] and suggest that the market has had no new entries since the 1990s. This is not supported by the record, which shows that Gianni is a recent, albeit smaller entry, and those retailers such as Costco, Sam's, and Econo have begun to market their own private label brands, and that distribution channels remain open. <u>Omega Environmental v. Gilbarco, Inc.</u>, 127 F.3d 1157, 1664 (9th Cir. 1997). Furthermore, this Court disagrees with Plaintiff's proposition that Law 75 creates a disincentive to the entry of new ice cream brands to

---

[20] To bolster its antitrust claims based on market foreclosure in detriment to competition, Sterling alleges that there are high entry barriers to the local ice cream distribution market, including: 1) the necessity of establishing a Direct Store Delivery System ("DSD system"), 2) purchasing trucks and freezers, 3) establishing sufficient route density, 4) obtaining ice cream brands to distribute, 5) failed entry by previous competitors, 6) market concentration between incumbents, 7) Puerto Rico Law 75, and 8) Payco's exclusivity agreements. PSUF # 198-199. Plaintiff alleges that Puerto Rico is a unique market because of its small size, and that local supermarkets, allegedly unlike those in the United States, do not have sufficient freezer warehouse capacity to store ice cream as inventory, requiring investment in a DSD system. As a result, ice cream must be frequently delivered in smaller quantities to in-store freezers, versus more infrequent deliveries to storage freezers, which is allegedly how the market works in the continental United States. Plaintiff alleges that this leads market entrants in Puerto Rico to face higher capital costs because they must invest in greater refrigeration technology and more frequent routes.

Civil No. 06-1015(SEC)

the local market. On the contrary, Law 75 can potentially protect smaller distributors by guaranteeing them a stable product supply and business relationship, granted they meet reasonable sales expectations.  Furthermore, prices have remained relatively stable, volume has grown, and so have Sterling's revenues. Therefore, even adopting the holistic view of the illegal behavior, as put forth by Sterling, does not bolster its claims of unreasonable foreclosure.

In addition to the exclusive dealing charges, Plaintiff also refers to *per se* illegal horizontal agreements and the allegedly unlawful coordination of activities between Nestlé PR and Payco before their merger.  These both must be examined as part of a merger occurring nearly seven years ago. Absent other facts suggesting an intentional strategy to restrain trade and foreclose the market, Ward's statements about controlling the local marketplace (see supra at 12-13) can only be interpreted as isolated incidents (PSMF # 43) and do not constitute facts sufficient to support a claim under the relevant statutes, more so when market data does not support Plaintiff's conclusion that the exclusionary contracts "choked" competition.

In sum, exclusive dealing contracts are a frequent practice in retail/wholesale food sales and distribution. Given their long-term presence before the Nestlé PR/Payco merger (DSUF # 113), there is minimal cause for concern. Joyce Beverages, Inc.. 555 F.Supp. 271, 277-278 (S.D.N.Y. 1983). The exclusivity agreements under analysis are licit, and have not negatively affected the structure of the market. Moreover, the record does not reflect illegal horizontal agreements in the pre-merger period, and Plaintiff has not shown significant price increases to consumers, despite years of inflation. Therefore, Plaintiff's claims under Section 1 of the Sherman Act for illegal restraint of trade and under Section 3 of the Clayton Act for illegal exclusive dealing are **DISMISSED WITH PREJUDICE**.

Civil No. 06-1015(SEC)

II.      *Monopolization and Attempted Monopolization (Causes of Action II and II: Section 2 of the Sherman Antitrust Act)*

As to the applicable law, ". . .§ 2 addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 455, 113 S.Ct. 884, 890 (1993).  The first is established by showing: "(1) the defendant has monopoly power and (2) the defendant has engaged in impermissible 'exclusionary' practices with the design or effect of protecting or enhancing its monopoly position." Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996); see also   Brunswick Corp v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690 (1977); U. S. v. Grinell Corp., 384 U.S. 563, 570 (1966)(stating "This is distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."). Case law has firmly established that  "[t]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." Spectrum Sports, 506 U.S. at 457.   Finding anti-competitive conduct requires identifying acts that ". . . harm the competitive process, and thereby harm consumers [. . .as opposed to] harm to one or more competitors . . ." U.S. v. Microsoft, 253 F.3d 34, 58 (D.C. Cir. 2001); see also Cargill v. Monfort of Colo., 479 U.S. 104, 107 (1986)(stating "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation."). Such prohibited conduct includes exclusionary acts, or others with an anti-competitive exclusionary effect, which "tend[] to destroy competition itself." Spectrum, 506 U.S. at 447.  Therefore, courts should not search for malice in business

**Civil No. 06-1015(SEC)**

dealing, rather they should look for those which may lead to lessened competition, Brooke Group Ltd, 509 U.S. 209 (1993), in the sense that the potential injury is, as mentioned in the damages section, only "of the type  that the statute was intended to forestall." Microsoft, 253 F.3d at 59 (citing Brunswick Corp., 429 U.S. at 487-488). If potentially anti-competitive conduct is found to exist, then this Court must discern if the conduct also has pro competitive effects, and using the rule of reason, balance the harms. Id. However, this must focus on the acts, and not on "the intent behind it." Id.

Establishing monopolization also requires a showing that the defendant possesses market power, which is the ability to negatively affect competition in the relevant market. Coastal Fuels, 79 F.3d at 196. Here, the relevant market has been established, so this Court must ask if Defendants are able to set prices substantially above costs, and also if they enjoy protection from the entry or expansion of rivals who could challenge potentially supra-competitive pricing. Id. (citing Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995).  In other words, "[m]arket power is the power to 'force a purchaser to do something that he would not do in a competitive market.'" Eastman Kodak, 504 U.S. 451, 464 (1992)(citing Jefferson Parish, 466 U.S. at 14).  Furthermore, "merely possessing monopoly power is not itself an anti-trust violation." Microsoft, 253 F.3d at 51.

Likewise, attempted monopolization under Section 2 requires showing that the defendant has acted in a predatory or anti-competitive manner within the market place, that this reflects a "specific intent to monopolize," and that there is a "dangerous probability of success." Ramallo Bros. Printing, Inc. v. El Dia, Inc., 392 F.Supp. 2d 118, 30 (D.P.R. 2005)(citing Specturm Sports, Inc. v. McQuillan, 506 U.S. 447 (1993)). Actual monopolization must be dangerously threatened, because ". . .the notion that proof of unfair or predatory conduct alone is sufficient to make out

**Civil No. 06-1015(SEC)**

the offense of attempted monopolization is contrary to the purpose and policy of the Sherman Act." Spectrum Sports, 506 U.S. at 456-457.

In light of this general framework for Section 2 of the Sherman Act, this Court must first ask if Defendants have market, or monopoly, power within the Puerto Rico ice cream market. The 2003 merger certainly created a dominant firm, which is also linked in a corporate relationship with the producer of Edy's, the star product for Sterling. While this market landscape certainly raises a red flag at first glance, it does not necessarily lead to Plaintiff's assertion that Defendants exercise market power. Market power exists only when competitors lack capacity to increase short run output, allowing for the monopolist to unilaterally restrict output in order to charge higher prices. Rebel Oil, 51 F.3d at 1434. Therefore, such a conclusion requires answering whether prices can be set to supra-competitive levels.

The record shows that Defendants cannot control prices, and that Sterling, and other competitors, continue to successfully compete. Namely, the uncontested facts do not reflect that prices are being set well above costs, nor does the record show that prices to consumers have grown significantly in the years following the merger. Furthermore, the price of ice cream offered to Sterling from Dreyer's has **remained virtually flat for nearly a decade**, despite high rates of inflation. Such price stability suggests Nestlé PR/Payco cannot set prices well above costs, which would be required for a finding of monopoly power. Coastal, 79 F.3d at 196. This, combined with the steady increase in sales volume in the whole  relevant market, weighs heavily against any inference that Defendants are able to raise prices by restricting output.

In building its case that a monopoly exists in the relevant market, Plaintiff again reverts to arguments regarding alleged entry barriers, such as Puerto Rico's small size, the high fixed capital costs of distributing ice cream, and Law 75.  It is established in antitrust law that an entry

**Civil No. 06-1015(SEC)**

barrier is a cost that is greater for a new competitor than for established rivals. <u>Los Angeles Land Co. v. Brusnwick Corp.</u>, 6 F.3d 1422, 1428 (9th Cir. 1993)(referencing 2 Areeda & Hovencamp, Antitrust Law parr. 409e at 303). These factors are equally challenging to Nestlé PR/Payco, and may play to Sterling's benefit, given that it distributes an already popular brand in a small market. Regarding the exclusives, these could potentially act as barriers, but as discussed in the previous section, this Court does not find them to be illegal, and they have not stopped Sterling's strong expansion, nor various new entries into the market. Sterling's sales and market share have increased during the relevant period to this action.[21] DSUF ## 97 & 129. Thus, the presence of new competitors, and Sterling's own expansion, weigh heavily against a finding of market power. <u>Ramallo Bros.</u>, 392 F. Supp. 2d at 118.

Nevertheless, it is illustrative to discuss Plaintiff's specific averments regarding anti-competitive conduct. Specifically, Sterling alleges: i) that the merger was an illegal attempt to create a monopoly , and that ii) Defendants directed Dreyer's to stop selling SkinnyCow to Sterling and that they increased the price of Edy's to weaken Sterling.

    A.    *The Merger*

A first obstacle faced by Sterling in questioning the merger, is that the uncontested facts of the case establish that Nestlé PR purchased Payco after years of stagnation and losses in Puerto Rico.  Accordingly, the company´s share of the Puerto Rico ice cream distribution market may be attributed to an historical accident of necessity, or a legitimate boardroom decision, whereby Nestlé PR had to acquire a more viable competitor in order to survive. Plaintiff points to various conversations, mostly involving Ward and other representatives of Defendants, both in

---

[21] As previously stated, Gianni recently entered the market, and while presumably on a smaller scale than both Plaintiff and Defendants' businesses, its entry is still significant for this Court's analysis, and Econo and Costco have also begun to self-distribute ice cream in their stores.

**Civil No. 06-1015(SEC)**

Switzerland and Puerto Rico, that suggest the combination aimed at creating a dominant firm. These are insufficient to bear the weight of an anti-trust claim, where damage to competition, not malice, is the operative test.

Sterling has also pointed to many instances of market share being a *sine qua non* requirement for success in Puerto Rico. PSUF # 69. Of course, such an argument is facially incongruent with the position that the Nestlé PR/Payco merger hurt competition, because, if 40% market share is necessary as suggested by this fact, then no more than two firms could exist. PSUF # 69. Sterling's claims further fall short because nothing on the record suggests the Puerto Rico consumer is paying monopoly prices for ice cream. Even more, as in Brunswick, the Nestlé/Payco combination seems to have enhanced competition.

Beyond the record painting a picture of sustained growth for Sterling, entry into the market by a new competitor (Gianni), shows entry barriers are not insurmountable and that the ice cream market remains highly competitive.  Sterling argues as if it had a right to an ideal relationship with Dreyer's where its own business  needs would dictate the price and variety of products supplied. Antitrust law does not pretend to provide such a guarantee, rather a competitive marketplace. Therefore, Sterling´s monopolization claim simply cannot prosper.[22]

As to the charge that Dreyer's, Nestlé S.A., and Nestlé PR, illegally shared confidential data regarding Sterling's business, these facts do not substantiate any claim of an anti-competitive strategy by Defendants. The allegations of data sharing are too vague to point to any real harm to competition, and this, even if illegal for other reasons, does not point to an antitrust violation. In light of the above, this Court finds that Defendants do not possess and have not exercised

---

[22] This Court also finds that Sterling´s attempted monopolization claim must be dismissed for failing to establish a dangerous probability that Nestlé will achieve market power.  The merger occurred over 6 years ago and the market remains "robustly competitive." Springfield Terminal Ry. v. Canadian Pac. Ltd., 133 F.3d 103, 110 (1st Cir. 1997).

**Civil No. 06-1015(SEC)**

monopoly power in the relevant market, and that the alleged anti-competitive acts were not illegal.

      **B.**    *Price Squeeze*

      In both 2004 and 2005, Dreyer's reduced the price support for Edy's ice cream given to Sterling, first by $0.10 per unit (from seventy-five cents per unit to sixty-five cents per unit), and then by an additional five-cents per unit for a total of 15 cents. DSUF ## 190-194; PSUF ## 139&142.[23] Price changes during the relevant period were limited to 15 cents per gallon. These were the only increases over almost a decade, when inflation in Puerto Rico neared 11% annually. DSUF # 87. During the relevant period, the price of Edy's has remained stable at $2.36. Between 2000 and 2001, Sterling received a forty-cent promotional allowance, this increased to seventy-five cents in 2002, which was reduced by fifteen cents between 2004-2005, as mentioned above. See Docket # 191-88 at 17. Accordingly, the present net price to Sterling for Edy's is 10% less than it was in 2000. Id.

      There is a controversy of fact as to how and why Dreyer's, possibly in conjunction wth Nestlé officials, made the decision to reduce the price support to Sterling in 2004 and 2005.  See, e.g., PSUF ## 93 & 95. Plaintiff alleges that the company responded to Ward's plan to squeeze Sterling, while Defendants allege that price increases were due to raw material price increases. DOSUF # 146. Sterling also alleges that Dreyer's assigned a product line, Skinny Cow, to Nestle PR/Payco after having previously encouraged Sterling to distribute the product before the merger. PSUF # 147 & 149. Defendants deny this assertion, citing the existence of an existing agreement with Dreyer's. DOSUF # 149.

---

[23]Defendants allege that price increases were due to raw material price increases. DOSUF # 146.

**Civil No. 06-1015(SEC)**

Plaintiff points to a range of documents regarding Defendants' business analysis of the Puerto Rico ice cream market, as proof of intent to monopolize. These ideas included the idea of swapping the Breyers line for the Edy's line (PSUF # 31), and eliminating Blue Bunny from the Payco portfolio (DSUF # 30), which eventually occurred due to Wells' initiative. Ward made comments to Nestlé during the merger negotiations that he believed that this would eliminate Blue Bunny as a competitor in the Puerto Rico market. PSUF # 39. During the negotiations for the Nestlé PR and Payco acquisition, Ward, who had a personal interest in Payco's market position, promoted eliminating Sterling´s price subsidy as a way of pressuring the distributor and strengthening the company's value for the second stage of the Payco acquisition. PSUF # 121 & 127. Defendants allege these statements regarding price increases to Sterling were made by Ward acting as a self-interested party during the sale of Payco, and in no way reflected Nestlé's position, nor did it reflect the fact that Dreyer's is a separate operational entity.

Ward continued his campaign to eliminate the Edy's price support after the merger. PSUF ## 134 & 138. However, Nestec and Nestlé PR executives informed Ward that his language and tactics were not acceptable under the corporate guidelines of each entity, and that they did not conform to the companies' established marketing policies. DOSUF # 138.

Sterling argues that Defendants acted in an illegal predatory fashion when Dreyer's withheld SkinnyCow and increased the price per unit of Edy's in Puerto Rico. However, this Court can identify no antitrust case law supporting the proposition that Dreyer's was obliged to grant distributorship of SkinnyCow to Sterling. Doing so might have been a magnanimous act towards a successful business partner, but businesses do not have a legal obligation to act loyally and Sterling has not shown why Dreyer's had an antitrust duty to deal with them.

**Civil No. 06-1015(SEC)**

In further argumentation, Sterling also alleges size-reductions in the Edy's half-gallon product line. However, this has not been sufficiently established in the uncontested facts, and appears to reflect general marketing practices, not any specific strategy regarding the Puerto Rico market. Furthermore, the record does not show that Sterling had to reduce prices to consumers as a result of the size change, nor that sales decreased.

In the context of "price squeeze" claims, the Supreme Court has held that ". . . a defendant with no antitrust duty to deal with its rivals has no duty to deal under the terms and conditions preferred by those rivals." Pacific Bell Telephone Co. v. Linkline Communications, Inc. 129 S.Ct. 1109, 1123 (2009). Linkline reiterated that the courts are ". . . ill suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.'" 128 St.Ct. at 1121 (citing Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 410 (2004)). In the present action, Dreyer's and Defendants may well have a "duty to deal" with Sterling on the wholesale level that arises out of the Puerto Rico fair dealership law and their particular contract, but this is not an antitrust question. Thus, Linkline renders Sterling's price squeeze and denial of new products claims toothless, because "[a]n upstream monopolist with no duty to deal is free to charge whatever wholesale price it would like; anti-trust law does not forbid lawfully obtained monopolies from charging monopoly prices." Id. at 1122.

Even before Linkline, claims by distributors were disfavored. For example, the ramifications on efficiency of a vertical merger, such as a producing firm (Nestlé PR) acquiring existing distributors (Payco), and then reducing costs by only dealing with wholly-owned distributors, may constitute an injury-in-fact, but not an antitrust injury as long as alternative sources of product exist. Serpa Corp. v. McWane, Inc., 14 F.Supp.2d 147, 150 (D.Mass. 1998)(citing Areeda & Hovenkamp, Antitrust Law 432-33 (1997 Supp.)). Accordingly, "an

Civil No. 06-1015(SEC)

intermediary distributor may only bring anti-trust claims when it: i) is injured by the direct anti-trust violation of a rival; ii) suffers directly as a result of illegal distribution restraints, or iii) qualifies as an exception." Id.; see also Florida Seed Co., Inc. V. Monsanto Co., 915 F.Supp. 1167, 1175 (M.D. Ala. 1995). Moreover, "[w]here, as here, output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand. Under these conditions, a jury may not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level." Brooke Group, 509 U.S. at 237.

Dreyer's is a separate corporate entity from all Defendants, but they are nonetheless owned and ultimately controlled by said company, thus barring conspiracy claims involving these two entities for the alleged "panoply of anti-competitive conduct."[24] On the other hand, if Dreyer's pricing and product allocation activities are found anti-competitive then they could be liable for damages under Illinois Brick Co. v. Illinois, 431 U.S. 720, 736, n. 16 (1977). This point of law is not in controversy, and the question remains if any acts seen as predatory or conspiratorial can be construed from the record of this case.

Sterling avers that Dreyer's decision to assign some new brands to Payco is proof of a conspiracy to cripple its distribution business. This Court can find no reason why new brands, such as Skinny Cow, must have necessarily been offered to Sterling. Under Trinko no claim on

---

[24] Sterling also alleges conspiracy claims related to the price increase. These are unfounded because the parties are commonly owned, and any discussions regarding joint marketing strategies occurred during the process of the Nestlé/Payco merger. Even if this were not the case Sterling's conspiracy claim would be very weak, because any price increases occurred after the merger and involve actions permitted under Linkline. Therefore, even Sterling's conspiracy claims are hindered by the need to show plausible causality between prohibited conduct and actual injury. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)(stating ". . . respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct. . ." so injury does not result from ". . . alleged conspiracies . . . that tend to benefit respondents. . .").

**Civil No. 06-1015(SEC)**

that front exists. Sterling has not been terminated as a distributor for Dreyer´s products, and continues to distribute, Edy's, Puerto Rico's leading brand.  Under such circumstances, the relationship can hardly be construed as predatory, and Sterling has brought no actions against Dreyer's for breach of contract or breach of fiduciary duty.

As has been discussed, Sterling's "price squeeze" and foreclosure claims are stymied by evidence of a competitive marketplace, and the merger of competitors is not in and of itself sufficient to prove antitrust damages. Cargill, 479 U.S. at 107. This Court agrees with Defendants that there is a dearth of evidence indicating increased consumer pricing or restricted output in the Puerto Rico ice cream market during the relevant period. Dreyer's never took any steps to make distributing Edy's unprofitable for Sterling. And there is even less indication that prices have risen to a supra-competitive level as required by the Clayton and Sherman Acts. Pool Water Products v. Olin Corp, 258 F.3d 1024, 1034 (9th Cir. 2001)(stating ". . . the antitrust laws are only concerned with acts that harm allocative efficiency and raise the price of goods above their competitive level or diminish their quality.")(internal citations omitted).  Puerto Rico consumers have not been hurt by either increased prices or reduced selection.

In light of the foregoing, this Court concludes that no monopoly has existed during the relevant period. Therefore, Plaintiff's claims under Section 2 of the Sherman Act for monopolization are **DISMISSED WITH PREJUDICE**.

Furthermore, the attempted monopolization claims also fail. First Circuit case law establishes that the requisite "dangerous probability" of monopolization cannot be shown when a plaintiff continues to compete and expand in the relevant market. Ramallo Bros., 392 F. Supp. 2d at 118. Here, Sterling's success and continued growth acts as a poison pill for their claims of attempted monopolization. Furthermore, Springfield Terminal Railway v. Canadian Pacific, Ltd.,

1    Civil No. 06-1015(SEC)

2    133 F.3d 103, 110 (1st Cir. 1997), held that an attempted monopolization claim is to be presumed

3    implausible if the challenged conduct has continued for over two years without damage to the

4    competitive structure of the relevant market.  The challenged merger in the present case took

5    place in 2003, the information sharing was contemporaneous to the merger, the alleged price

6    squeeze occurred in 2005 and 2006, and Payco's exclusives have existed since the 1990s. These

7    facts do not permit an inference that there is a dangerous probability of success in monopolizing

8    the market in question. Therefore, Plaintiff's Section 2 Sherman Act attempted monopolization

9    claims are **DISMISSED WITH PREJUDICE**.

10          III.     *Conspiracy to Monopolize (Claim V; Sections 2 and 1 of the Sherman Antitrust*

11                   *Act)*

12

13          Sterling's final cause of action is for conspiracy under Sections 1 and 2 of the Sherman

14   Act, for alleged collusion between Nestlé PR and Payco beginning in 2001 up until their 2003

15   merger.  The standard for a conspiracy claim under Section 1 of the Sherman Act, includes the

16   following elements which require showing:  "(1) a contract, combination, or conspiracy among

17   two or more independent actors; 2) that unreasonably restrains trade; and 3) is in, or substantially

18   affects, interstate or foreign commerce." Dyno Nobel, Inc. v. Amotech Corp., 63 F.Supp. 2d 140,

19   147 (D.P.R. 1999)(citing Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768

20   (1984)).  The test for a Section 2 claim for conspiracy to monopolize is similar, although with a

21   slightly higher burden of proof. Id. at 150.  To wit, a plaintiff must show: "(1) the existence of

22   a conspiracy, (2) an overt act in furtherance of the conspiracy, and (3) specific intent to

23   monopolize." Id. (citing United States v. Yellow Cab Co., 332 U.S. 218, 225 (1947)).  In other

24   words, Sterling must show that the different Nestlé actors and Payco shared a similar intent.

25   However, Sterling´s allegations that Nestlé and Payco have illegally conspired to monopolize the

26                                         Page  37

**Civil No. 06-1015(SEC)**

ice cream distribution market necessarily fail as to all post-merger acts, because the coordinated acts of parent companies and their subsidiaries cannot constitute a Sherman Act claim for conspiracy. Copperweld, 467 U.S. at 776.  This Court understands that said rule applies to both Section 1 and Section 2 claims.

Moreover, the record does not contain evidence of any conspiratorial acts, beyond the declarations of Ward during the process of promoting the sale of his business, Payco, to Nestlé, a potential buyer.  Such "boardroom ruminations" should not be construed as predatory behavior. William Inclis / Sons Baking Co. v. ITT Cont´l Baking Co., 668 F.2d 1014, 1028´29 (9th Cir. 1981). Other discussions of coordinated marketing alluded to by Sterling occurred after Nestlé and Payco had entered into the merger process with PROMA, and have caused no conceivable damage to Sterling, whose business has grown.

It is important to note that the two companies were in the process of exploring a merger, and conducting due diligence. In this sense, the allegation that the two were sharing financial information is specious. Antitrust law is not intended to stand as an obstacle to potential mergers and acquisitions. Adopting such a strict view, as proposed by Plaintiff, would substantially hinder legitimate business undertakings. Moreover, no link has been proffered between this alleged improper sharing of information and a cognizable injury to Sterling. Therefore, the company is not entitled to a favorable inference regarding this exchange of information, because they have failed to proffer a plausible theory of injury. As such, the required link of an act unreasonably restraining trade cannot be met.

The alleged illegal sharing of information led to the eventual combination of Nestlé PR and Payco, which was approved by PROMA. This Court does not find that the merger itself was

**Civil No. 06-1015(SEC)**

conspiratorial, and it did not lead to an uncompetitive market place. Such a merger, even if it creates a large or dominant firm, is not *per se* illegal. Cargill, 479 U.S. at 116.

Also at issue here is the sharing of financial information in the pre-merger period, and the acquisition of 90% of retail freezer space at Ralph's. Docket # 196 at 53-54.   Defendants allegedly colluded by discussing the possible ramifications of Payco potentially losing Unilever, a major Nestlé competitor if the merger were to go through. See PSUF 106.   Moreover, no valid conspiracy claim can be brought against commonly-owned companies. Copperweld, 467 U.S. at 752. Therefore, any claims based on acts occurring after the merger, which was finalized either on June 11 or July 2, 2003, are facially without merit.  The undisputed facts of the case show that said agreement with Ralph's was signed in August, 2003, well after the merger. Even if discussions occurred in the months leading up to the combination, this Court finds that they could not sustain a charge of conspiracy as they would be an inextricable part of the acquisition.

The rhetoric cited by Plaintiff in its efforts to oppose summary judgment is eye-opening, but ultimately fails to sustain the theory of a pre-merger conspiracy alleged in the Amended Complaint.[25] Therefore, given the absence of facts plausibly supporting a clear conspiracy, and the apparent lack of antitrust damages related to these acts, Plaintiff's claims for conspiracy under both Sections 1 and 2 of the Sherman act are **DISMISSED WITH PREJUDICE**.

*IV. Commonwealth Antimonopoly Claims*

The remainder of Sterling´s claims are grounded on Puerto Rico law. Exercising jurisdiction over pendent state law claims once the federal law claims are dismissed is discretional. See Newman v. Burgin, 930 F. 2d 955, 963-964 (1st Cir. 1991)(holding that "the

---

[25] The Court has not discussed  in detail said allegations, or Defendants' replies thereto, because they have not been linked to any specific acts creating antitrust injury or affecting the relevant market. Such a lack of causality to any antitrust harm leaves the allegations moot, even if the facts were proven true.

**Civil No. 06-1015(SEC)**

power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one substantial federal claim in the lawsuit...[and] the district court has considerable authority whether or not to exercise this power, in light of such considerations as judicial economy, convenience, fairness to litigants, and comity). Because this Court will grant summary judgment as to the federal law claims, it will not exercise supplemental jurisdiction over the state law claims. Therefore, Sterling´s claims arising from Puerto Rico law and Payco's Counterclaim for tortious interference are **DISMISSED without prejudice.**

**Conclusion**

The applicable law and the undisputed facts of this case demonstrate that Sterling has not established antitrust injury with respect to either its Sherman Act or Clayton Act claims, nor has it established the necessary elements for any of the federal antitrust violations alleged in the Amended Complaint. Accordingly, Defendants' motion for summary judgment is **GRANTED** and Plaintiff's federal claims are **DISMISSED WITH PREJUDICE**. Sterling's state law claims shall be **DISMISSED WITHOUT PREJUDICE**, as will be Defendant's Counterclaim.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 23rd day of June, 2010.

*S/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge